UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Diamone Wilson, et al.,                               Case No. 3:20-cv-2498

           Plaintiff,

       v.                                            MEMORANDUM OPINION
                                                           AND ORDER

Lieutenant Michael Russo, et al.,

           Defendants.

## I. INTRODUCTION

Pursuant to my November 8, 2021 Order, (Doc. No. 32), Defendant Village of Put-In-Bay (the "Village") moves for a protective order of the Paragon Investigations Report (the "Report") commissioned by the Village following the events underlying this action and submitted the Report for an *in-camera* review. (Doc. No. 35). Intervening Plaintiffs Trae Caffey, Spencer M. Robinson, Shalon T. Shelton, Dameyion M. Smith, and Aaron W. Tucker filed a brief in opposition to the Village's motion, (Doc. No. 36), and the Village filed a reply brief. (Doc. No. 37).

## II. BACKGROUND

On June 6, 2020, Defendants Corporal Terry Rutledge and Lieutenant Michael Russo of the Village of Put-In-Bay Police Department initiated a traffic stop of a golf cart occupied by Plaintiffs and Intervening Plaintiffs after observing the golf cart fail to stop at a stop sign. While Russo was writing a citation to the driver, Plaintiff Ryan Hollingshed, Russo allegedly observed someone in the golf cart pass an unknown item to Plaintiff Diamone Wilson and directed Rutledge to investigate.

The interactions between the white officers and primarily black occupants of the golf cart then quickly escalated.

Plaintiffs and Intervening Plaintiffs allege Russo and Rutledge each pointed their firearms at the unarmed group and threatened to shoot. At some point, backup officers arrived at the scene; those officers allegedly also drew weapons on the group. Although no one was shot with a firearm, Intervening Plaintiff Trae Caffey and Plaintiff Hollingshed were struck by a Taser at least once. Additionally, Plaintiffs and Intervening Plaintiffs allege they were all forced to the ground and arrested.

Plaintiffs and Intervening Plaintiffs arrived at the Put-In-Bay Police Department around 9:00 p.m. and were placed in holding cells. Plaintiffs Wilson, Paris Hunter, and Panzie Hunter allege they were released without being arraigned or advised of any charges against them at around 3:30 a.m. on June 7, 2020. Plaintiff Hollingshed was transported to the Ottawa County jail and was detained there until the morning of June 8, 2020, when he was brought before a judge and informed that charges against him had been dropped. Intervening Plaintiffs allege they were held in jail two days and charged with crimes that were eventually dropped once they had retained counsel.

The June 6, 2020 traffic stop – which occurred less than two weeks after George Floyd was murdered – was filmed and that recording was broadly distributed on the Internet. In the aftermath, Put-In-Bay Mayor Jessica Dress released the following statement on June 11, 2020:

> First and foremost, I am deeply saddened by the events that transpired within the village of Put-in-Bay during the evening of Saturday, June 6.
>
> These are terribly trying times.
>
> Officers of the village police department initiated a traffic stop that evening, which has now since made headlines, for unsafe operation of a golf cart. The unfolding of events that followed are being reviewed with a critical eye --- by local supervising officers, the county sheriff, county prosecutor, and myself. I will be requesting approval from the village council to seek and hire experts to complete an impartial and fair evaluation of the traffic stop, and the subsequent decisions and actions taken by officers of the Put-in-Bay Police Department.

> The island saw an unusually high visitor volume for this same weekend compared to previous years. The crowds were unexpected in the volume that continued to arrive throughout the day. A matching volume of local officers, working to prevent potential problems, normally would have been on staff for such an anticipated influx. Our officers eventually called for assistance from the Ottawa County Sheriff's Office and a response was immediately initialized to keep the peace for all of our visitors and residents.
>
> It will take time to sort out all the facts of the evening. In the mean time, the police department has been directed by myself to release all public records available, under Ohio Sunshine law, to requesting parties.
>
> Transparency in our operations is the best service possible I can provide to the public. As a community, we hold our police department accountable for any and all of its decisions.
>
> Therefore, effective Wednesday, June 10, I placed Put-in-Bay Police Chief Steve Riddle on paid administrative leave pending the outcome of an official inquiry. Subsequently, Lt. Mike Russo and Sgt. Melissa Wilde, submitted their verbal resignations to me and returned to their home, abandoning their scheduled evening patrol shift.
>
> Capt. Matt Mariano is serving as the department's acting chief, pending outcome of an investigation and any possible consequences yet to be determined.
>
> I am deeply grateful for the overwhelming community support I've received in taking swift and decisive action to hold our officers accountable. I am deeply grateful for the support from Ottawa County Sheriff Steve Levorchick in providing our community with an immediate response last weekend, and for coordinating with Capt. Matt Mariano today to be prepared for the coming weekend.
>
> I have high confidence in our department's ability to continue to provide a safe and welcoming environment for all of our residents and visitors. With assistance from Sheriff Levorchick, we will be successful this weekend and through the rest of the summer as he aides us in changing the direction of our department.
>
> The village will strive for strong and effective leadership for the future of our island community, and I look forward to taking that path forward in cooperation with our island and county leaders.

(Doc. No. 36-1 at 3-4).

On June 26, 2020, the Put-In-Bay Village Council held a special meeting, the stated purpose of which was:

>  to discuss personnel matters including the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee(s), for possible council action regarding the appointment and/or promotion of a public employee, for possible council action regarding the establishment of an auxiliary police unit, and for possible council action on the hiring of an outside investigative firm.

(Doc. No. 37-2 at 1). The meeting minutes state the following as related to Paragon:

> Discussion took place on Paragon Investigations and its necessity.
>
> Boyles moved council enter executive session for the discussion of personnel matters including the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee(s), and for possible council action regarding the appointment and/or promotion of a public employee. Koehler second.
>
> Roll: Koehler; yes, Faris; yes, Berry; yes, McCann; yes, Boyles; yes, Market; yes.
>
> Council entered Executive Session at 12:44 PM.
>
> Koehler moved to exit Executive Session. Boyles second.
>
> Roll: Market; yes, McCann; yes, Boyles; yes, Berry; yes, Faris; yes, Koehler; yes. Motion carries.
>
> Council exited executive session at 1:17 PM.
>
> Boyles moved to authorize the Village Solicitor and the Mayor to enter into an agreement with Paragon Investigations. Market second.
>
> Roll: Boyles; yes, Berry; yes, Koehler; yes, Faris; yes, McCann; yes, Market; yes. Motion Carries.

(*Id.* at 3). There is no testimony as to what was said during the Executive Session prior to the vote in favor of entering the agreement with Paragon.

With authorization of the Village Council, Put-In-Bay Solicitor Susan Keating Anderson mailed Paragon a letter engaging Paragon's services and identifying the scope of issues to be investigated. (Doc. No. 35-2). The Engagement Letter authorized Paragon to perform the investigation "in accordance with [Paragon's] Proposal attached [t]hereto as Exhibit A." (*Id.*). The "Exhibit A" Paragon Proposal provided a list of "bullet points compiled to represent items that

4

should or may be obtained to properly perform the investigation into the conduct of all persons related to the incident in the Village of Put-In-Bay on June 6, 2020." (Doc. No. 37-1).

Paragon performed the investigation and delivered the Report now at issue to the Village. The Report was not released to the public. But on December 8, 2020, the Sandusky Register published an article reporting the impending retirement of Chief Riddle, which resulted from "negotiations with Riddle following the completion of the investigation." (Doc. No. 36-2).[1] The article quotes Mayor Dress as stating, "'Following the investigation it was clear to me we needed a change in leadership… I asked the village solicitor to negotiate an amicable parting of ways.'" (*Id.*).

### III. DISCUSSION

Intervening Plaintiffs now seek to discover the Report. The Village asserts the Report is protected from discovery under the federal work product doctrine codified in Federal Rules of Civil Procedure 26(b)(3) and 26(b)(4)(D).[2]

Rule 26(b)(3) states: "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3). "Rule 26(b)(4)(D) essentially extends the work product protection codified in Rule 26(b)(3) to facts known and opinions held by non-testifying, consulting experts." *Lindon v. Kakavand*, No. 5:13-CV-26-DCR-REW, 2014 WL 12648464, at *1 (E.D. Ky. Apr. 29, 2014). Together, Rules 26(b)(3) and 26(b)(4)(D) generally protect materials prepared by a non-testifying

---

[1] The Exhibit is a scan of the article as printed in the Sandusky Register newspaper. In the process of scanning the article, it appears some of the lines were inadvertently cut off. The article can be viewed in full online at: https://sanduskyregister.com/news/292366/riddle-retiring-as-pib-police-chief/.

[2] "The work-product doctrine is a procedural rule of federal law; thus, Federal Rule of Civil Procedure 26 governs this diversity case." *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009) (further citation omitted).

expert "in anticipation of litigation." *See, e.g., Univ. Hosps. Health Sys. v. Pohl Inc. of Am.*, No. 1:15 CV 2461, 2018 WL 1474368, at *4 (N.D. Ohio Mar. 23, 2018); *Lindon*, 2014 WL 12648464, at *1.[3]

As the party alleging the Report is protected by the work product doctrine, the Village bears the initial burden of showing it was prepared "in anticipation of litigation." *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006) (further citation omitted). To satisfy its burden, the Village must show: "(1) [the Report] was created *because of* [the Village]'s subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) [ ] that subjective anticipation of litigation was objectively reasonable." *Id.* at 594 (emphasis added). "If both elements are proven, the burden shifts to [Intervening Plaintiffs] to demonstrate undue hardship or exceptional circumstances." *Univ. Hosps. Health Sys.*, 2018 WL 1474368, at *4; *see also* Fed. R. Civ. P. 26(b)(4)(D)(ii) (A party may discover what it otherwise could not "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.").

In considering whether the first element is met, a court must determine "the function that the document serves" or "the driving force behind the [document's] preparation" by "examin[ing] not only the document[] [itself], but the circumstances surrounding the document['s] creation." *Id.* at 595 (further citation and internal quotation marks omitted). "[A] document will not be protected if it would have been prepared in substantially the same manner irrespective of the anticipated litigation." *Id.* at 593-94.

There is no dispute that Paragon was retained, and the Report prepared in response to the June 6 incident. The parties dispute what the "driving force" was for its preparation.

Solicitor Anderson attests she "was aware as soon as [she] was notified of the incidents that took place on June 6, 2020, that litigation was likely, especially given the widespread public controversy and questions surrounding the death of George Floyd which took place just days before

---

[3] Intervening Plaintiffs do not challenge Paragon's status as a non-testifying, consulting expert.

6

the June 6, 2020 incidents." (Doc. No. 35-1). She states it was because of this "anticipation of litigation" that Paragon was retained to assess "the liability of the Village and officers of the Village's police department." (*Id.*).

Intervening Plaintiffs challenge the Village's alleged motive, arguing the Village retained Paragon "for internal review of personnel, policies and procedures," (Doc. No. 36 at 2) – a business reason – and not "in anticipation of litigation." Specifically, Intervening Plaintiffs contend "the driving force behind the Paragon investigation was a desire by the Mayor and Council to profess accountability to the public, reorganize the police department personnel, and review police policies and procedures." (*Id.* at 4). In support, Intervening Plaintiffs cite statements made by Mayor Dress.[4]

There is no dispute that Mayor Dress stated in her press release that she "w[ould] be requesting approval from the village council to seek and hire experts to complete an impartial and fair evaluation of the traffic stop, and the subsequent decisions and actions taken by officers of the

---

4   Intervening Plaintiffs also rely on the website of a Paragon Investigations based in Virginia to show the company retained does not provide litigation-related services. (Doc. No. 36 (citing https://parasys.com/investigations/)). Confusingly, the Village addresses the substance of this argument but fails to recognize the website on which the argument was based is not the website of the "Paragon Investigations" that the Village retained. (Doc. No. 37 at 4).
    The Engagement Letter was addressed to Tim Oleksiak of Paragon Investigations LLC, with an address in Cleveland, Ohio. (Doc. No. 35-2). It was sent "[v]ia Email to toleksiak@paragonprivatinvestigations.com." (*Id.*). The URL "paragonprivatinvestigations.com" will not load as a webpage as it appears to contain a typographical error. But a Google search revealed Tim Oleksiak provides investigative services at Paragon Investigations with the website: https://paragonprivateinvestigations.com/. *See About Us*, Paragon Investigations, https://paragonprivateinvestigations.com/aboutus.html (last visited March 8, 2022). This website also provides a contact number with the Cleveland area code "216" and features a photo of the Cleveland skyline, including the Carl B. Stokes United States Courthouse. (*Id.*).
    In sum, I conclude a reasonable assumption can be made that the Paragon Investigations retained operates the website https://paragonprivateinvestigations.com/, and not https://parasys.com/investigations/. Further, the website of the Paragon Investigations that prepared the Report states, "PARAGON provides … Expert Witness Testimony for both Criminal and Civil proceedings." *About Us*, Paragon Investigations, *supra*. Therefore, Intervening Plaintiffs' argument that the company does not offer litigation-related services does not apply to the firm involved in these events, and I reject it, accordingly.

7

Put-in-Bay Police Department." (Doc. No. 36-1 at 3). Mayor Dress then proclaimed her support for "[t]ransparency in our operations," "police department accountab[ility]," and "strong and effective leadership for the future of our island community." (*Id.* at 3-4).

I agree with Intervening Plaintiffs' contention that Mayor Dress's statement as a whole suggests the investigation would be an internal review of the police department's performance due to the Village's desire for transparency and accountability of the incident, and ultimately, change to policies and procedures governing conduct of officers acting on behalf of the department.

But the scope of the investigation defined by the Engagement Letter with Paragon demonstrates the Village's intent that the investigation be performed "in anticipation of litigation." (Doc. No. 35-2). It identifies the following "scope of issues" to be investigated:

> 1. Review of the June 6, 2020, incident, including: methods used by officers at the scene, timing and decision to call for back-up from ODNR and local sheriffs' departments, weapons issued and carried by officers at the scene.
>
> 2. Review of **PD** practices and protocols prior to June 6, 2020, incident, including: training practices (police de-escalation tactics, mass gathering considerations, and handling of diverse groups, etc.); weapons issued/available to officers, hiring practices of PD, background and investigatory protocols of applicants for employment, enforcement of internal policies, management and leadership of PD overall.
>
> 3. Recommendations for improvement growing [sic] forward in the above areas.

(Doc. No. 35-2 at 1).

Apparently conceding the first "issue" identified does relate to an anticipation of litigation, Intervening Plaintiffs contend the second and third do not. (Doc. No. 36 at 2).

Contrary to Intervening Plaintiffs' assertion, (*id.*), the Village's "training practices, hiring practices, and management and leadership of the police department" relate directly to the Village's potential municipal liability for the officers' conduct during the June 6 incident. As stated by the Village, "[w]henever a municipality anticipates litigation involving possible constitutional violations by one of its personnel, the municipality certainly anticipates a claim against the city for failure to

8

train or for discriminatory policies, procedures, and/or customs." (Doc. No. 37 at 3). Further, this anticipation was well-founded, as Plaintiffs did, in fact, assert a municipal liability claim against the Village, alleging it "facilitate[ed] a custom and/or practice of misconduct" and "fail[ed] to adequately train and/or supervise" the officers. (Doc. No. 1 at 13-14). I conclude the second "issue" to be investigated supports the Village's assertion that the Report was prepared in anticipation of litigation.

With respect to the third action item identified in the Engagement Letter, I agree "recommendations for improvement" do not relate to an anticipation of impending litigation. But the requested recommendations are linked to the "above areas," both of which are related to the Village's "anticipation of litigation." Further, this item's placement as last on the list suggests "recommendations for improvement" were not the Village's priority when initiating the investigation. Therefore, while this item's inclusion indicates the Report also may serve a business purpose, the Engagement Letter demonstrates the "driving force" behind the Report's preparation was the Village's "anticipation of litigation."

The Paragon Proposal incorporated into the Engagement Letter as "Exhibit A" provides further evidence that the first and second "issues" identified were to be investigated "in anticipation of litigation."[5] (Doc. No. 35-2; Doc. No. 37-1).

---

[5] As noted by Intervening Plaintiffs in their opposition brief, the Village failed to file the "Exhibit A" Paragon Proposal with its Motion for a Protective Order. (Doc. No. 36 at 1). Instead, the Village filed the Paragon Proposal for the first time as an attachment to its reply brief and raised a new argument based on the Paragon Proposal in that brief. (Doc. No. 37 at 2 (citing Doc. No. 37-1)). Intervening Plaintiffs did not move to strike the new argument or the Paragon Proposal as evidence. They also do not move to file a sur-reply to meaningfully respond to the document or new argument. Perhaps this is because the Paragon Proposal does "shed light on the tasks which [Paragon] understood it was being asked to perform," as Intervening Plaintiffs presumed. (Doc. No. 36 at 1). Mindful of the procedural defect, I accept the Paragon Proposal as evidence for purposes of analyzing this discovery issue but caution the Village to act with greater care in future briefing.

The Paragon Proposal lists items to be "obtained to properly perform the investigation into the conduct of all persons related to the incident in the Village of Put-In-Bay on June 6, 2020," and provide "a comprehensive, un-biased and objective look into the actions [and] backgrounds of individuals involved, both private citizens and the police." (Doc. No. 37-1). It clarifies the nature of the investigation with respect to each group of persons involved, stating:

> For the police, any training, policies and procedures and rules and regulations that may have governed their behavior on June 6, 2020. For civilians, any criminal history or prior police interaction that may have contributed to their behavior on June 6, 2020.

(*Id.*). Paragon's charge to investigate the individual citizens involved (i.e., Plaintiffs and Intervening Plaintiffs) shows the investigation was not strictly an "internal review" performed for the business purpose of informing personnel and policy matters.

Although some of the items listed for review relate to personnel and policy matters, those items also serve the purpose of informing the Village's municipal liability as addressed in the second issue. Additional items listed show those dual-purpose items were to be reviewed with a mind toward litigation. For example, Paragon was to review: "EMS run sheets, hospital reports," "[i]njuries reported and documented by police or civilians," "[d]ocumentation of criminal charges," and "[d]ocumentation of charges dismissed." (*Id.*). While these items are relevant to potential liability and damages, they have little to no bearing on personnel matters or "recommendations for improvement."

The Paragon Proposal's inclusion of litigation-related items for review, including "[c]ivilian background checks and arrest records (booking and release information)," (*id.* at 1), shows the Report would not have been "prepared in substantially the same manner irrespective of the anticipated litigation." *Roxworthy*, 457 F.3d at 593-94. My *in-camera* review of the contents of the Report confirms this finding.

10

Even though the Report may have resulted in personnel decisions and police policy changes, I conclude the evidence shows the Report was prepared because of the Village's subjective "anticipation of litigation." I also conclude the Village's anticipation was objectively reasonable in light of the particular circumstances of the June 6 incident and social unrest at the time. Intervening Plaintiffs do not contend otherwise.

Because the Village has satisfied its burden on both elements, "the burden shifts to [Intervening Plaintiffs] to demonstrate undue hardship or exceptional circumstances." *Univ. Hosps. Health Sys.*, 2018 WL 1474368, at *4. Intervening Plaintiffs make no attempt to show they cannot "obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D)(ii). Therefore, they are unable to rebut the Village's "in anticipation of litigation" showing.

## IV. CONCLUSION

Because the Report was prepared by a non-testifying, consulting expert "in anticipation of litigation," and because Intervening Plaintiffs make no showing of "exceptional circumstances," the Report is not discoverable. The Village's motion for a protective order is granted. (Doc. No. 35).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge